**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-411 (APM)** |
| **v.** | : | |
| | : | |
| **STEWART PARKS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Stewart Parks to 15 months of incarceration, within the applicable Guidelines range, 12 months of supervised release, 60 hours of community service, and $617 in restitution.

## I.      Introduction

Defendant Stewart Parks, a 30-year-old real estate investor and former Congressional candidate, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Following a two-day bench trial, this Court convicted Parks of Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2)(D), Parading, Demonstrating, or Picketing in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2)(G), and Theft of Government Property in violation of 18 U.S.C. § 641.

A significant sentence of incarceration is warranted in this case because of Parks' brazen violation of the law on January 6, 2021 and his perjured testimony about those criminal acts at trial. Parks knew from a multitude of ways that he was not permitted to enter onto Capitol grounds or into the Capitol building on January 6, 2021: He smelled the tear gas in the air as he worked his way through the crowd of thousands on the west front of Capitol grounds, he saw rioters feet away from him overrun line after line of police officers defending the building, and he heard the glass around the Senate Wing Door entryway shatter and the alarms blare as rioters feet away from him first broke into the building that day. Yet he still entered the Capitol, paraded through the building with other rioters for over 45 minutes, and then stole U.S. Capitol Police equipment from a security checkpoint on his way out of the building.

Such conduct alone warrants incarceration, but Parks demonstrated his complete lack of contrition by spinning numerous, implausible falsehoods at trial while testifying under oath. Despite voluminous contradictory evidence (including his own Instagram posts), Parks claimed to have not seen police lines overrun, even though he filmed those events from feet away. He claimed to believe police had opened a Capitol building door for him, even though he watched from feet

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

away as rioters crawled through an adjacent window and then kicked the door open. And he claimed that he began looking for a way out of the building approximately ten minutes after entry, even though he walked right past his original point of entry minutes later, choosing instead to remain inside the building for another half hour. These are but a few of the lies Parks told on the stand—to say nothing of the lies he has told on social media and in media interviews—and they demonstrate a degree of disrespect for this Court's truth-seeking function warranting a substantial punishment.

The Court must also consider that Parks' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Parks's crime support a sentence of 15 months of incarceration, 12 months of supervised release, 60 hours of community service, and $617 in restitution.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

### *Defendant Parks' Role in the January 6, 2021 Attack on the Capitol*

On the morning of January 6, 2021, Parks flew from his home in Nashville, Tennessee to Baltimore, Maryland with his co-defendant Matthew Baggot. From there, they traveled by rental car to Washington, D.C. in advance of the Joint Session of Congress convening that day to certify

the Electoral College vote in the 2020 presidential election. Parks posted the following "Story"[2]

on his Instagram account containing a photo taken after boarding his 7:30 a.m. flight.



*Image 1: Parks Instagram Story from morning of Jan. 6, 2021*

Parks and Baggot arrived at the National Mall between 1 and 1:45 p.m., after President

Trump had concluded his speech at the Save America Rally at the Ellipse area adjacent to the

---

[2] A Story is an image or video that Instagram users can share with their followers for a limited
duration of time (typically 24 hours). Users can annotate these images or videos with overlayed
text prior to posting.

White House. Parks[3] walked to the U.S. Capitol grounds from the west. He crossed into the restricted perimeter established around the Capitol that day and began working his way through the crowd that had already formed on the west front of the Capitol grounds despite police efforts to disperse the crowd and keep it from reaching the building. Parks eventually reached the front of the West Plaza crowd where it met a line of police officers using bike barricades to prevent rioters from encroaching further toward the building.



*Image 2: Parks near the police line on the West Plaza at 1:39 p.m.*

At 1:45 p.m., Parks posted the following Story on his Instagram. He later testified at trial that when he wrote, "they're gassing us," he was referring to teargas deployed by the U.S. Capitol Police to dispel other rioters. Trial Transcript, May 2, 2023, at 331:2-22.

---

[3] Parks was accompanied by Baggot throughout the day unless otherwise mentioned.



*Image 3: Parks Instagram Story at 1:45 p.m. on west front of U.S. Capitol grounds*

At approximately 1:50 p.m., rioters overran a badly outnumbered line of police officers to the north of the West Plaza who were defending an entryway to covered scaffolding erected over the Northwest Staircase. That scaffolding entryway provided access to the Upper West Terrace and, from there, to the first floor of the Capitol building. Parks proceeded past the West Plaza and joined that crowd of rioters funneling into the scaffolding. Once inside the scaffolding, Parks stood steps away and watched as police fought to re-establish their line as they were repeatedly and violently pushed back toward the Capitol building. During this period, Parks posted the following Story to his Instagram account.



*Image 4: Parks' Instagram Story on the Northwest Stairs underneath inauguration scaffolding.*

Parks posted another Instagram Story inside the scaffolding feet away from police as they retreated up the Northwest Stairs. In that story, rioters can be seen throwing objects at the officers as they rioters gain ground up the staircase.



*Image 5: Parks' Instagram Story on the Northwest Stairs underneath inauguration scaffolding.*

As police lines were overrun, Parks continued to move up the staircase with the crowd until they reached the Upper West Terrace. From there, Parks quickly walked to the Senate Wing Door on the west side of the Capitol building. Again from just feet away, Parks watched other rioters smash open windows to the left and right of the doorway, crawl through the windows, and kick open the door from the inside. At trial, Parks testified that he saw "people taking [an] aggressive nature toward those windows." Trial Transcript, May 2, 2023, at 353:3. Rioters kicked open the door at 2:13 p.m., and Parks entered the Capitol building through that door only 12 seconds later.



*Image 6: Parks entering the Capitol building through the Senate Wing Door at 2:13 p.m.*

This Senate Wing Door entry was the first breach of the U.S. Capitol building that day. Minutes later, the Capitol building went into lockdown and both the House and Senate adjourned their proceedings.

By 2:16 p.m., Parks and others had reached the Ohio Clock Corridor, which is the primary anteroom to the Senate Chamber, where Vice President Pence had just been evacuated by Secret Service agents and where United States Senators were still sheltering in place. After another rioter deployed a fire extinguisher near police officers holding back rioters in the Ohio Clock Corridor, Parks left the room and navigated back to his point of entry at the Senate Wing Door. He continued past that door toward the center of the building.

At 2:31 p.m., Parks reached the Will Rogers Hallway, which connects the Rotunda to the House Chamber anterooms. At that time, a significantly outnumbered group of police officers had formed a line between a crowd of rioters and the main entryway to the House Chamber, where members of Congress were sheltering in place. Parks moved to the front of this crowd. At 2:35

9

p.m., Parks was just feet away as rioters began fighting with the police line, which was quickly overpowered as Parks and others pushed past them into the hallways surrounding the House Chamber.

At 2:45 p.m., Parks reached the Upper House Door entryway, which is located between the House Chamber and the East Front of the Capitol. This entryway included a security checkpoint for members of Congress and other authorized personnel to enter. Before exiting, Parks approached this security checkpoint, picked up a handheld metal detector wand from a table at the checkpoint, and put it back down. Seconds later, as Parks walked past the checkpoint toward the doorway, he picked the metal detector wand again and walked out the doorway with it.



*Image 7: Parks stealing a metal detector hand wand (identified by green arrow) from a USCP security checkpoint.*

Parks re-entered and exited this entryway several times over the next fifteen minutes, exiting the last time at 3:01 p.m., when he was ultimately forced out of the Capitol building by

police officers through the Upper House Door. Parks spent more than 45 minutes inside the Capitol building on January 6. Parks posted an Instagram Story he appears to have taken while standing in the breezeway immediately outside the Upper House Doors captioned, "The party was fun until the SWAT showed up."

On the evening of January 6, 2021, Parks messaged with another Instagram user about his presence at the Capitol that day. Parks wrote to the other user, "We ain't giving up," followed by, "No way in hell Biden is getting the presidency." Around the same time, another Instagram user asked Parks to send him "the videos you deleted." Parks told this user, "If anyone ask say sadly I wasn't able to make it to dc this time."[4]

**Parks' False testimony at trial**

Parks testified at trial on May 2, 2023 before this Court. His testimony included many misrepresentations, several of which were identified by the Court in rendering its verdict.

For example, Parks testified that he entered the Capitol building because he heard there were going to be political speakers holding authorized events there. He testified that, even after he entered the building, he was not sure whether those events would be taking place inside the Capitol building. Transcript, May 2, 2023, at 296:7-8 ("For all we know, the event was taking place at the Capitol, so we just walked closer to the Capitol."); 301:17-19 ("So we just essentially just aimlessly wandered around the building because at this point we're like, well, where's the event

---

[4] Parks continued to downplay his culpability following January 6, 2021. For example, in 2022, Parks sought election to the House of Representatives to represent Tennessee's 5th Congressional District. During his campaign, Parks participated in numerous interviews in which he lied about the events of January 6 and his participation in them. For example, in an interview with Heartland Liberty TV on June 24, 2022, Parks claimed that he was allowed to approach the Capitol building, that he saw no barricades in his way, and that he witnessed no violence. Gov. Sent. Ex. B. On July 11, 2022, in a second interview with Heartland Liberty TV, Parks stated that the police voluntarily stood aside to allow rioters to enter the Capitol building, and that the police at any time could have indicated to rioters to stop but did not do so. Gov. Sent. Ex. C.

that's supposed to take place."). That testimony was obviously false. Parks gained entry to the Capitol building only after following closely behind other rioters who violently overpowered police lines, smashed through windows, and kicked open the door through which Parks entered. He knew well that this was not some pathway to a scheduled, sanctioned event to take place inside the building that day.

Parks also testified that he saw or heard no indications from police on Capitol grounds that he was not permitted to enter the Capitol building, Transcript, May 2, 2023, at 288-289, a lie he also repeated to the media while running for Congress in 2022. Parks own Instagram posts contradicted that lie, see pages 7-8. One post showed a line of police officers standing between rioters and the building, with Parks adding the caption, "We're getting in." Another post contained video footage of rioters actually attacking those officers and driving them toward the stairs. That Parks could not have watched this scene and honestly believed that it depicted the police voluntarily letting violent rioters into the building is preposterous.

Third, Parks testified that when he entered the Capitol through the Senate Wing Door, he believed U.S. Capitol personnel had opened the door to let him and others into the building. 299:19-34. Parks testified to this even after video evidence showed him standing just feet away as rioters smashed the windows, crawled through them, and kicked open the door. At that point, Parks could see clearly that there were no officers on the other side of the door, only the rioters who had just crawled through the window moments earlier.

As yet another example, Parks testified that when another rioter set off a fire extinguisher in the Ohio Clock Corridor, he realized he "probably shouldn't be here" and began "actively seeking an exit out of the building." 306:11-15. But Capitol CCV showed that this fire extinguisher was set off at approximately 2:22 p.m. When Parks then walked down to the first floor of the

Capitol and back through the hallway to the Senate Wing Door's unobstructed entrance three minutes later (at 2:25 p.m.)—the same entrance he entered through 12 minutes earlier—he continued past that entrance toward the center of the Capitol, remaining for over 30 minutes longer. Even after he found the exit he would eventually leave through, the Upper House Doors, he exited and reentered multiple times before finally being forced out by police.

*The Charges and Trial Verdict*

On May 24, 2021, the United States charged Parks by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), 40 U.S.C. § 5104(e)(2)(D), (E), and (F), and 18 U.S.C. § 641. On June 3, 2021, law enforcement officers arrested him in Columbia, Tennessee. On June 21, 2021, the United States charged Parks by a five-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), 40 U.S.C. § 5104(e)(2)(D) and (G), and 18 U.S.C. § 641. Parks waived his right to a jury trial, and on May 3, 2023, the Court found Parks guilty on the five counts charged in the Information.

### III.    Statutory Penalties

Parks now faces a sentencing on five counts of conviction: 18 U.S.C. §§ 1752(a)(1) and (2), 40 U.S.C. § 5104(e)(2)(D) and (G), and 18 U.S.C. § 641. As noted by the U.S. Probation Office, Parks faces up to one year of imprisonment on each of these counts and a fine of up to $100,000. PSR at ¶ 99. In addition, the Court may stack the sentences of one or more counts of conviction, to the extent it is necessary to produce a combined sentence equal to the appropriate total punishment determined by the Court. *See* PSR at ¶ 102; U.S.S.G. § 5G1.2(d).

**The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Parks' adjusted offense level under the Sentencing Guidelines as follows:

**Group One:** Counts One (18 U.S.C. 1752(a)(1)) and Two (18 U.S.C. 1752(a)(2))

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Adjustment for Obstruction of Justice (U.S.S.G. §3C1.1) | +2 |
| Total Adjusted Offense Level | 12[5] |

---

[5] The PSR correctly concluded that Parks' total offense level for Counts One and Two is 10, evidently based on the following analysis: (i) Counts One and Two are grouped together under the Guidelines (*see* U.S.S.G. § 3D1.2; PSR at ¶ 39); (ii) while the Statutory Appendix lists two guidelines for Section 1752 offenses (U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass)), the "most appropriate" guideline (U.S.S.G. §1B1.2 n.1) for the offense conduct charged in Count Two—which requires proof of "disorderly or disruptive" committed "with intent to impede or disrupt the orderly conduct of Government business or official functions," 18 U.S.C. § 1752(a)(2)—is Guidelines §2A2.4 (PSR at ¶ 36); and (iii) Count Two's resulting total offense level (12) is higher than the total offense level for Count One alone (8). Nonetheless, for the sake of completeness, the government also sets forth the offense level computation for Count One alone:

| | |
|---|---|
| **Base Offense Level**: The most applicable guideline for Count One is § 2B2.3 (Trespass). | **4** |
| **Specific Offense Characteristics**: On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Therefore, a two-level enhancement applies. USSG § 2B2.3(b)(1)(A)(vii). | **+2** |
| **Adjustment for Obstruction of Justice (U.S.S.G. §3C1.1)** | **+2** |
| **Adjusted Offense Level (Subtotal):** | **8** |
| **Total Offense Level** | **8** |

14

| | | |
|---|---|---|
| **Group Two**: Count Five (18 U.S.C. § 641) | | |
| Base Offense Level (U.S.S.G. §2B1.2(a)(2)) | | +6 |
| Adjustment for Obstruction of Justice (U.S.S.G. §3C1.1) | | +2 |
| Total Adjusted Offense Level | | 8 |
| **Multiple Count Adjustment to Group One** (U.S.S.G. §3D1.4(a) | | **+2** |
| **Total Offense Level** | | **14** |

*See* PSR at ¶¶ 30-60.

The U.S. Probation Office calculated Parks' criminal history as category I. PSR at ¶ 63. Accordingly, the U.S. Probation Office calculated Parks' total adjusted offense level at 14, and his corresponding Guidelines imprisonment range at 15 to 21 months. PSR at ¶¶ 101. As noted above, the maximum term for each count of conviction in this case is 12 months, but the Court may stack the sentences imposed on individual counts if necessary to produce the appropriate punishment determined by the Court. U.S.S.G. § 5G1.2(d).

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 15 months of incarceration, within the advisory Guidelines range, to be followed by 12 months of supervised release.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Parks' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Parks, the absence of violent or destructive acts is not a mitigating factor. Had Parks engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Parks' case is the consciousness of his wrongdoing. Parks was among the first to breach the U.S. Capitol building on January 6, 2021, entering through the Senate Wing Door entrance less than a minute after the initial breach at that location. The unlawfulness of his entry—and just as importantly, the significance of this breach—would have been abundantly clear to Parks at that moment. This is in part due to the long, violent path he and other rioters took to reach this entryway from the edge of Capitol grounds. As documented above, Parks encountered police line after police line and saw them overrun time and again by the unrestrained physical force of rioters intent on reaching the building.

16

Also significant here is the path Parks took within the building and the length of time he remained inside. He came within feet of the entryway to both chambers of Congress, and in both instances, Congressmembers and Senators were still sheltering in place inside. Parks spanned nearly the entire length of the building during the three-quarters of an hour he was inside, having entered on the northwest corner of the building, moving up and down between the first and second floors of the building, and finally exiting (when forced out by police) on the southeast corner of the building. Parks may not have been violent that day, but the duration of his breach made his conduct particularly disorderly to the proceedings that day.

Finally, Parks' statements during and after the Capitol breach evince an abject lack of appreciation as to the wrongfulness of his actions, let alone contrition for this conduct, as discussed further below. For example, when the police were finally able to clear Parks and other rioters from the Upper House Door shortly after 3 p.m. that day—after Parks snatched the handheld metal detector from the nearby security checkpoint—Parks wrote on social media, "Party was fun til the SWAT showed up." Those words reflect a complete failure to appreciate, let alone acknowledge, the wrongfulness and harmfulness of his conduct that day.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  The History and Characteristics of Parks**

Parks is a 30-year-old real estate investor residing in Nashville, Tennessee. He holds a bachelor's degree from the University of Mississippi, which he obtained in 2016. In 2022, Parks registered as a candidate to represent Tennessee's 5th Congressional District in the U.S. House of Representatives, but ended his campaign after failing to secure the nomination in the Republican primary on August 4, 2022.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time … should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Parks has demonstrated an acute need for deterrence through his conduct during and after Jan. 6, 2021. From his travel to Washington D.C. to his entry into the Capitol building and to the days that followed, Parks repeatedly posted on social media celebrating his conduct that day, then attempting to hide this conduct. As a candidate for the U.S. House of Representatives, Parks minimized and misrepresented his conduct that day, and he continued to do so under oath at trial. Even after this Court found him guilty.

This conduct demonstrates Parks feels no remorse for his conduct that day. Even after the trial evidence proved that his presence, combined with the presence of other rioters, drove the U.S. Capitol into lockdown for hours, that it forced the day's critically important Congressional proceedings to a halt, and that it caused enormous harm to the building and those who defended it that day, Parks still refuses to accept responsibility for his conduct. That refusal makes the need for specific deterrence a major factor in this case.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this unprecedented assault on the Capitol, ranging from misdemeanors like this one, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Parks based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Some of the considerations bearing on the appropriate sentence for Parks overlap, of course, with those for his co-defendant, Matthew Baggott, who was sentenced by this Court on August 5, 2022 to three months of incarceration and 12 months of supervised release. Parks and Baggott traveled to Washington, D.C. together, they took the same path onto Capitol grounds up to the Senate Wing Door entryway, and they entered and exited the building together.

However, there are several important differences between the two that warrant a more significant sentence for Parks. First, unlike Baggott, Parks stole a metal detector wand from a security checkpoint. That theft, of course, accounts for an additional charge against Parks—theft of government property (Count Five), in violation of 18 U.S.C. §641—which was not brought

against Baggott. But there is more: stealing a metal detector wand—the very equipment that the Capitol Police relies on keep the Capitol and Congress safe—during a riot reflects a substantially higher level of disrespect for both the law and the police officers tasked with guarding the building not shared by Baggott.

Second, Parks' state of mind before, during, and after the events of January 6 provides aggravating evidence of his consciousness of wrongdoing and his lack of remorse. Unlike Baggott, Parks lied to the media about the Capitol breach while running for office and he lied about his conduct while testifying under oath.

To be sure, Baggot at times engaged aggressively with officers while at the Capitol in a manner Parks did not, but crucially, Parks was found guilty at trial instead of admitting his guilt and accepting responsibility for his criminal conduct as Baggott did. As a result, Parks now faces five counts of conviction—none of which he has accepted responsibility for—compared to Baggott's single 18 U.S.C. § 1752(a)(2) count. His failure to accept responsibility and his obstruction of justice for this trial perjury results in a significantly higher Guidelines range than the one that applied to Baggott.

This case is also comparable in several respects to *United States v. Russell Dean Alford*, Criminal No. 21-cr-263, in which the defendant was found guilty at trial and sentenced to 12 months of incarceration and 12 months of supervised release for violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). Parks and Alford were both among the rioters who entered the Capitol at times and locations when it was readily apparent that they were not permitted to do so. Following the Capitol breach, Alford also continued to make misleading public statements on social media regarding the events at the Capitol that day and his individual conduct, just as Parks did. And at trial, Alford provided false testimony on many of the same subjects Parks

21

did: his awareness that it was unlawful for him to enter the Capitol building, his testimony about seeing police defenses and barricades on Capitol grounds, and his intentions in going to the Capitol that day. Unlike Parks, however, Alford did not steal any government property during the January 6 attack on the Capitol and was therefore not convicted of violating 18 U.S.C. § 641. In sentencing Alford to 12 months of incarceration, Judge Chutkan cited the defendant's false testimony and his clear lack of remorse for the seriousness of his conduct. Parks—who, in addition, stole security equipment from the Capitol Police—should receive a comparatively more severe sentence of 15 months of imprisonment.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Parks was convicted of violations of offenses under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because Parks in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Parks responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Parks to pay a total restitution amount of $617, which is the sum of (i) $117 in restitution for stealing a Capitol Police metal detector wand from the Upper House Door screening point (Count Five); and (ii) $500 in restitution based on his remaining offenses on January 6. The $117 amount, more specifically, reflects the replacement cost of the metal detector wand that Parks stole on January 6. *See* Sent. Ex. A. The remaining $500 in restitution accounts for the loss proximately caused by Parks' participation, with thousands of other rioters, in the January 6 attack on the Capitol—*i.e.*, Parks' conduct at issue in Counts One and Two. The latter amount fairly reflects Parks' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging or stealing property. Accordingly, a total restitution amount of $617 avoids sentencing disparity.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Parks to an aggregate sentence of 15 months of incarceration, 12 months of supervised release, 60 hours of community service, and $617 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, but is no greater than necessary.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Hutton Marshall*
        J. HUTTON MARSHALL
        BENET J. KEARNEY
        Assistant U.S. Attorneys
        DC Bar No. 1721890
        601 D Street, N.W.
        Washington, D.C. 20579
        (202) 809-2166
        Joseph.hutton.marshall@usdoj.gov